APGAR v. CONNELL.

(Supreme Court, Appellate Division, First Department.   May 3, 1912.)

APPEAL AND ERROR (§ 1012*)—DEEDS (§ 211*)—REVIEW—FINDINGS—EVIDENCE.

In an action by a daughter of an intestate to cancel deeds executed by all the children, conveying the property of the intestate to their mother, where plaintiff's testimony that the nature of the instruments was not explained to her was positively contradicted by all the rest of the family, the attorney who drew the deeds, and the notary, and plaintiff's own testimony failed to show that the mother made any representations, had anything to do with the transaction, or that she requested any of the children to execute the deeds, a finding for plaintiff is against the weight of the evidence, and will be reversed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3990–3992;  Dec. Dig. § 1012;*  Deeds, Cent. Dig. §§ 637–647, 649;  Dec. Dig. § 211.*]

Appeal from City Court of New York, Special Term.

Action by Mary A. Apgar against Ellen Connell to set aside certain deeds for fraud and false representations.   From a judgment for plaintiff, defendant appeals.   Reversed, and new trial ordered.

See, also, 134 N. Y. Supp. 1125.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

Somerville & Somerville, of Brooklyn (Louis J. Somerville, of Brooklyn, of counsel), for appellant.

Leander B. Faber, of Jamaica (Charles H. Street, of Huntington, on the brief), for respondent.

CLARKE, J.   On November 1, 1905, one Patrick J. Connell died intestate in the city of New York, leaving him surviving his widow, the defendant, Ellen Connell, and as his only heirs at law and next of kin the following six children, namely, the plaintiff, Mary A. Apgar, then 38 years of age, Christopher A. Connell, Joseph F. Connell, John A. Connell, Elizabeth G. Sullivan, and Ellen B. Connell. At the time of his death he was seised and possessed of three parcels of real estate situated in the city of New York.   The intestate had been suddenly taken ill.   The daughter, the plaintiff, had been summoned from Richmond Hill, where she resided, and the priest had been called in.   She arrived at the house before he died.   After the last rites of the church had been administered, the plaintiff and her mother and all the children, being present, Father Matthew said in a loud voice:

"Is there anything you wish to say, Mr. Connell?"

He said:

"Yes;  I want to leave all my property to my dear little wife."

Thereupon the oldest son, Christopher, called up an attorney, Mr. Somerville, over the telephone, in the presence and hearing of the others:

"I told him to come and prepare the papers for my father's last statement, because I asked the doctor and the priest if he was able to do those things, and they answered me, 'Yes.' "

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

But Patrick J. Connell passed away before Mr. Somerville arrived at the house.

The five other children all testified that they and Mrs. Apgar had a general conversation in regard to carrying out the last expressed wish of their father, and that they all agreed to do so. Joseph Connell testified:

"We did have several conversations; but the conversation was the night that Mr. Somerville was there, and we were all up in the back room, and Mr. Somerville, how we would do this thing, and I finally said to Mr. Somerville, in the presence of all of them, 'Couldn't we all sign our rights away by selling it to my mother for a time?' And he said, 'Yes.' Q. That is before the deeds were there? A. Yes; the day my father died. And Mr. Somerville says, 'Well, yes; you could do that; there are other ways.' And then Mr. Somerville said, 'Are there any of you boys married?' They all said, 'No,' except I. He said, 'Your wife will have to sign.' I said, 'I have no doubt my wife will be ready to sign with me, and I will explain it to her.' * * * In the meantime, after the death, we went downstairs, and on the stairway leading to the basement my sister Mary asked what it meant, and I explained to her. Q. What did you say? A. 'It means that we are to give all the property to my mother, as my father wished.' She said, 'It is a good idea for us all to do that.'"

It was arranged that Mr. Somerville should draw the necessary papers and return on the Monday night following the funeral, which was on Saturday, and he did so. On that Monday night, accompanied by a notary, he went to the house, and in the presence of all the children three deeds and a release were executed and acknowledged by all of the children. The testimony is that the papers were read and explained, and that the transaction took about 2½ hours to complete. The deeds were acknowledged on November 6, 1905 and were recorded November 8th.

The summons in this action is dated October 21, 1909, and the complaint avers that:

"On or about November 6, 1905, the defendant, well knowing the plaintiff's condition, circumstances, and inexperience, and trustfulness, but fraudulently taking advantage of the same, falsely represented and caused to be falsely represented to plaintiff that it was necessary for plaintiff to sign certain papers in order to expedite the settlement of the estate of her said father. * * * That the aforesaid deeds to the above-named defendant, in which the name of this plaintiff appears according to said record, are the papers which defendant procured and induced plaintiff to sign as hereinbefore set forth, and are null and void and of no effect as against this plaintiff, and were obtained by fraud, without consideration, and without any intent on the part of this plaintiff to convey any interest to the defendant."

Plaintiff was her only witness. She testified:

"That when Mr. Somerville came he had some papers. * * * He called our names in rotation, and we signed them. That is all that I know. Q. After they were signed, they were acknowledged before the notary? A. Yes. Q. Were those papers read to you at that time? A. No, sir; they were not read. There was nothing said to me as to what the papers were that I was signing, and I asked no questions. * * * I thought, at the time of signing the papers, that the estate was to be settled up in a year. That was my opinion. I placed all confidence in my mother, * * * that she was to do right, and that the estate was to be settled up in a year, and I was to get my share of it, which I never received or heard of it. I did not know that these papers which I signed were three deeds, conveying three parcels of property belonging to my father, to my mother. If I had known that they were such deeds, I would not have signed them."

She further testified under cross-examination:

"There was nothing said in my presence about my father's wishes in regard to the property that he left. * * * I didn't take them in my hand; only signed my name to them. Q. Was there any discussion before they were signed? A. No, sir. Q. Do you mean to say this lawyer was there in the room with all you people, and that not a word was said before these four papers were signed by you? A. Yes. * * * There wasn't a word spoken by anybody before these papers were signed in that room where we were. Nobody said anything. The lawyer did not say anything, nor did the notary public say anything, nor did any of the family say anything—no, sir. Q. And you saw these papers lying on the table, and you took up the four papers and signed them? A. No; I did not take them up. I was called in rotation, and we signed them. * * * I say that the lawyer read out the name, but he did not say what this was, or what it was for."

Upon that evidence, without a word of corroboration, positively contradicted by all the rest of the family, the attorney, and the notary, and without a word from any one tending to show that the defendant, the plaintiff's mother, made any representations, had anything to do with procuring the attorney, having the papers drawn, or requesting any of the children to execute the deeds, the Special Term has determined that the three deeds and the general release are fraudulent, null, void, and of no effect as against the plaintiff as to her undivided one-sixth part of the real property. This judgment is against the overwhelming weight of the evidence, and there is not even a scintilla of evidence to support the allegation of fraud.

The judgment appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.